# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF IOWA
### CENTRAL DIVISION

LAWRENCE TYNDALL et al.,

        Plaintiffs,

vs.

STATE OF IOWA, et al.,

        Defendants.

No. C18-3025-LTS

**MEMORANDUM OPINION AND ORDER ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

_____

## I.     INTRODUCTION

This case is before me on a motion (Doc. No. 89) for summary judgment by defendants Fort Dodge Correctional Facility (FDCF), Don Harris, Iowa Department of Corrections (IDOC), the State of Iowa, Robert Johnson and Judy Morrison.  Plaintiffs Bryon Bauer, Damon Calaway, Raymond Cooper, James Langdeaux, Dustin Nielsen, Zachary Ramirez, Trey Redowl, Harold Thomas and Lawrence Tyndall have filed a resistance (Doc. No. 96).  Defendants filed neither a reply nor a response to plaintiffs' statement of additional facts.  Oral argument is not necessary.  *See* Local Rule 7(c).

## II.     PROCEDURAL HISTORY

Plaintiffs commenced this action pro se on April 3, 2018.  They allege defendants have violated their religious rights under the Religious Land Use and Institutionalized Persons Act (RLUIPA), 42 U.S.C. §2000cc, and, pursuant to 42 U.S.C. § 1983, their constitutional rights under the First Amendment's free exercise of religion clause, U.S. Const., amend. I.  Doc. 1.  They seek declaratory and injunctive relief, compensatory damages and punitive damages.  *Id.* at 14.

On April 17, 2019, plaintiffs filed an amended complaint (Doc. 31).  I granted plaintiffs' motion to appoint counsel on August 19, 2019.  *See* Doc. 65.  Plaintiffs then

filed, through counsel, a motion (Doc. 74) to amend their complaint again. That motion was granted. Doc. 75. Plaintiffs filed their second amended and substituted complaint (Doc. 76) on January 13, 2020, and defendants filed their answer (Doc. 77) on January 27, 2020. Trial is scheduled to begin April 26, 2021.

### III. SUMMARY JUDGMENT STANDARD

Any party may move for summary judgment regarding all or any part of the claims asserted in a case. Fed. R. Civ. P. 56(a). Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

A material fact is one that "'might affect the outcome of the suit under the governing law.'" *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Thus, "the substantive law will identify which facts are material." *Id.* Facts that are "critical" under the substantive law are material, while facts that are "irrelevant or unnecessary" are not. *Id.*

An issue of material fact is genuine if it has a real basis in the record, *Hartnagel v. Norman*, 953 F.2d 394, 395 (8th Cir. 1992) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986)), or when "'a reasonable jury could return a verdict for the nonmoving party' on the question." *Woods v. DaimlerChrysler Corp.*, 409 F.3d 984, 990 (8th Cir. 2005) (quoting *Anderson*, 477 U.S. at 248). Evidence that only provides "some metaphysical doubt as to the material facts," *Matsushita*, 475 U.S. at 586, or evidence that is "merely colorable" or "not significantly probative," *Anderson*, 477 U.S. at 249–50, does not make an issue of material fact genuine.

As such, a genuine issue of material fact requires "sufficient evidence supporting the claimed factual dispute" so as to "require a jury or judge to resolve the parties' differing versions of the truth at trial." *Anderson*, 477 U.S. at 248–49. The party moving

2

for entry of summary judgment bears "the initial responsibility of informing the court of the basis for its motion and identifying those portions of the record which show a lack of a genuine issue." *Hartnagel*, 953 F.2d at 395 (citing *Celotex*, 477 U.S. at 323). Once the moving party has met this burden, the nonmoving party must go beyond the pleadings and by depositions, affidavits, or otherwise, designate specific facts showing that there is a genuine issue for trial. *Mosley v. City of Northwoods*, 415 F.3d 908, 910 (8th Cir. 2005). The nonmovant must show an alleged issue of fact is genuine and material as it relates to the substantive law. If a party fails to make a sufficient showing of an essential element of a claim or defense with respect to which that party has the burden of proof, then the opposing party is entitled to judgment as a matter of law. *Celotex*, 477 U.S. at 322.

In determining if a genuine issue of material fact is present, I must view the evidence in the light most favorable to the nonmoving party. *Matsushita*, 475 U.S. at 587–88. Further, I must give the nonmoving party the benefit of all reasonable inferences that can be drawn from the facts. *Id.* However, "because we view the facts in the light most favorable to the nonmoving party, we do not weigh the evidence or attempt to determine the credibility of the witnesses." *Kammueller v. Loomis, Fargo & Co.*, 383 F.3d 779, 784 (8th Cir. 2004). Instead, "the court's function is to determine whether a dispute about a material fact is genuine." *Quick v. Donaldson Co., Inc.*, 90 F.3d 1372, 1376–77 (8th Cir. 1996).

## IV.    RELEVANT FACTS

The following facts are undisputed except where noted otherwise:[1]

### A.    *Defendants' Statement of Material Facts*

Plaintiffs are current or former inmates of FDCF.[2]  FDCF provides offenders time and opportunity to observe and practice their religious faith.  FDCF does not provide religious services but allows volunteers to provide such services within the prison.  The IDOC contracts with various religious consultants, who serve as a resource for the prisons in meeting the religious needs of offenders.  The religious consultants also aid the IDOC and prisons in resolving difficult questions as to the practice of a faith within the prison environment and answering questions about the traditions and religious obligations of a faith.  The consultants may also serve as a faith leader of the faith they represent.  In this

---

[1] The parties' combined effort to allege, and respond to, the material facts in this case constitutes a giant fail that has made it much more difficult for the court to assess their respective arguments. First, plaintiffs have denied various statements of material fact with no citations to the record. While plaintiffs indicate their denials are based on their statement of additional material facts, which does contain citations to plaintiffs' appendix, this is an unhelpful practice that violates this court's rules.  *See* N.D. Ia. L.R. 56(b) ("A response to an individual statement of material fact that is not expressly admitted must be supported by references to those specific pages, paragraphs, or parts of the pleadings, depositions, answers to interrogatories, admissions, exhibits, and affidavits that support the resisting party's refusal to admit the statement, with citations to the appendix containing that part of the record.").  Second, and while less concerning, I note that plaintiffs submitted their additional material facts at the end of their responses to defendants' statement of material facts.  *See* Doc. 96-1 at 11-14.  This should have been filed as an electronic attachment to their brief under the same docket entry.  *See* N.D. Ia. L.R. 56(b)(3). Third, and most perplexing, defendants simply failed to respond to plaintiffs' statement of additional material facts.  *See* N.D. Ia. L.R. 56(d) ("The moving party must, within 7 days after service of the resisting party's statement of additional facts, file a reply in which the moving party expressly admits, denies, or qualifies each of the resisting party's numbered statements of additional facts.").  Because the "failure to reply to an individual statement of material fact with appropriate appendix citations may constitute an admission of that fact," *see* Local Rule 56(d), I have separated the parties' statements of fact to make it clear which statements I may deem to be admitted due to defendants' failure to respond.

[2] The only plaintiffs who remain at FDCF as of the date of defendants' motion are Langdeaux and Nielsen.  The other plaintiffs have either completed their sentences or have been transferred.

role, the consultant is not a State of Iowa contractor, but a religious volunteer. The consultant for the Native American faith is Judy Morrison.

Morrison serves as a point of contact for all Native American issues that may arise in the IDOC. She regularly visits all IDOC institutions to ensure that the Native American community is receiving the necessary resources and also leads the communities in the appropriate Native American traditions.[3] While many different tribes, with historical and cultural differences, may be present in a particular prison, the goal is to provide common Native American traditions that are consistent with nearly all Native American groups.

Morrison serves as a consultant to IDOC staff to assure they are addressing Native American issues appropriately. Part of her role is determining who qualifies as a Native American. One of the ways Morrison determines membership is whether the inmate has a Bureau of Indian Affairs (BIA) number or a Certificate of Degree of Indian Blood (CIBD), which officially recognizes an individual as a member of a particular tribe. This is not an exclusive requirement, but one factor Morrison utilizes. She also speaks to members of the offender's family, or the community they claim to be part of, in determining whether an individual qualifies as Native American.[4]

On May 25, 2017, Morrison provided instructions to all IDOC institutions with regard to the types and colors of headbands that could be worn by Native American offenders in the IDOC. Morrison provided these instructions in response to questions by the IDOC and Native Americans as to the use and requirements for headbands. The parties dispute whether this was a religious decision.

---

[3] Plaintiffs deny Morrison is properly qualified to serve as a religious leader for their faith. Doc. 96-1 at 3.

[4] Plaintiffs deny the circumstances under which Morrison can decide whether an individual should be allowed to participate in the group. Doc. 89-2 at 8; Doc. 96-1 at 7. Plaintiffs admit that removal or denial from a group may constitute a religious decision but deny that Langdeaux's removal from the Native American group was a religious decision.

On December 19, 2017, Morrison came to FDCF and entered the area outside the prison buildings where the sweat lodge was located. Generally, the area in and around the sweat lodge is not subject to the search of prison staff due to the nature of Native American beliefs. The parties dispute whether Morrison is allowed to enter the area. Plaintiffs deny that she is and state she is not a properly authorized religious volunteer for the Native American community. Defendants state that as the leader of the Native American group, she is allowed to enter this area. *See* Doc. 89-2 at 4, 9, 12; Doc. 96-1 at 4, 8, 10. In any event, Morrison entered the area on December 19, 2017, along with a security staff member of FDCF. Morrison discovered items considered contraband by the prison. Morrison made the decision to place this area, and all associated religious items, off limits to the Native American inmates. Plaintiffs admit that the finding of two weapons (wooden clubs) and other contraband items was a security issue. However, the parties dispute whether this was a religious decision or a prison operations decision. They also dispute whether Morrison desecrated the area or any sacred items during the search. Plaintiffs state that, as a woman, Morrison should not have touched any sacred items and that she is not a properly authorized religious volunteer from the Native American community. Doc. 96-1 at 10. Defendants acknowledge plaintiffs' allegations that Morrison desecrated the area and items and that some Native American offenders refuse to use the area and items for this reason. Doc. 89-2 at 12. However, they state this is a religious dispute. *Id.*

On January 16, 2018, Morrison, along with Deputy Warden Don Harris, Treatment Director Netti Renshaw and Robert Johnson, met with the Native American community at FDCF. They cautioned the Native American inmates that only authorized religious items should be in possession of the religious group. At the start of the meeting, Morrison indicated Langdeaux was not a member of the Native American community. The parties dispute whether Langdeaux's exclusion from the Native American community was a religious decision and whether staff at FDCF had any control or input in that

decision.  *See* Doc. 89-2 at 6-7; 96-1 at 6.[5]  They agree that Langdeaux was removed due to his behavior/disagreement with Morrison.  They dispute whether Morrison was qualified to make this decision.

Langdeaux has been removed from the Native American group on two occasions. He was removed in the early 2000s and the parties dispute whether he remains in this status as of today.  Langdeaux is permitted to have a ceremony by himself each week. Unless and until he is reinstated, Langdeaux is not eligible to participate with the Native American offenders in any ceremony or tradition.

**B.    *Plaintiffs' Statement of Additional Material Facts***

Morrison's May 25, 2017, directive provided: "Each person may have 3 bandannas only of light blue in color and must be on their property list.  If bandannas are not on the property list they will be considered contraband.  Bandannas will be changed to light blue through attrition."  Doc. 96-2 at 3.  Wearing headbands is an integral part of Native American religious practice.  The color of the headband is significant as different colors represent different spiritual matters.  For example, black, red, yellow and white represent the four directions and complete what is known as the medicine wheel, a visual representation of the cosmic circle or higher power.

Langdeaux states he is denied the right to wear headbands at FDCF.  He notes that while incarcerated at the Iowa State Penitentiary (ISP), he was allowed to wear headbands at any time.  He also references an IDOC policy that a religious accommodation allowed at one institution will follow the offender to other institutions.  Other plaintiffs (Nielsen and Thomas) have had similar experiences between ISP and FDCF regarding headbands. Kepple was denied the right to wear a yellow headband in August 2019.  He was informed that Morrison stated it was up to the Warden to decide if headbands could be worn at FDCF.

---

[5] Plaintiffs did not cite to the record in support of this denial.

Morrison and an FDCF employee were observed damaging the buffalo skull altar during the search of the sweat lodge. Bauer filed a grievance regarding desecration of the sweat lodge on December 19, 2017. Plaintiffs admit that searches of the sweat lodge are allowed but that they must be made in the presence of a Native American inmate who is knowledgeable and trusted in the handling of sacred items. They state that per prison policy, the inmate must be present and touch the items under the direction of staff and that staff may not touch any sacred item. They further state that no qualified inmate was present for the search on December 19, 2017. They note that sweat lodges are fashioned after the traditional religious customs of the Sioux and that sacred items of men and women are to be kept separate. Morrison, as a woman, is not permitted to touch male sacred objects. The sweat lodge was removed in October 2019 by defendants without the proper religious ceremony.

Plaintiffs state Morrison harbors animus towards the Sioux people and has made disparaging remarks about them. She is not Sioux and plaintiffs state she has admitted (in another lawsuit) that she "holds no authority over Sioux customs." They state she also does not hold herself out as a "religious expert," that she has never explained her Native background to the incarcerated Native American community and that she has contradicted the theology of other identifiable Native American spiritual leaders.

Langdeaux is "a first[-]generation lineal descendant of an enrolled member of a federally recognized Indian tribe, the Rosebud Sioux Tribe." Doc. 96-2 at 4. At ISP, Langdeaux was recognized as an American Indian. Langdeaux is "Two-Spirited (gender fluid)," *id.* at 5, and states Morrison opposes this.[6] Langdeaux is a follower of The Heyoka Society and claims Morrison (who is not a member) is unable, unwilling and unqualified to provide spiritual assistance to Langdeaux.[7]

_____

[6] Plaintiffs' second amended complaint (Doc. 76) contains no claims of discrimination or retaliation based on Langdeaux's gender identity.

[7] Plaintiffs' second amended complaint (Doc. 76) contains no claims related to lack of access to a religious leader for Langdeaux's particular faith.

# V.    DISCUSSION

"Section 1983 provides a remedy against any person who, under color of state law, deprives another of rights protected by the Constitution." *Collins v. City of Harker Heights*, 503 U.S. 115, 120 (1992) (internal quotation marks omitted).  Plaintiffs allege violations of their rights under the free exercise of religion clause of the First Amendment of the United States Constitution.  The First Amendment, which applies to the states through the due process clause of the Fourteenth Amendment, *see Cantwell v. Connecticut*, 310 U.S. 296, 303 (1940), provides that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof . . . ." U.S. Const. amend I.  Plaintiffs also allege violations of RLUIPA, which provides in relevant part:

> [n]o government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution . . . . even if the burden results from a rule of general applicability, unless the government demonstrates that imposition of the burden on that person –
>
> > (1)    is in the furtherance of a compelling governmental interest; and
> >
> > (2)    is the least restrictive means of furthering that compelling governmental interest.

42 U.S.C. § 2000cc-1(a).

Plaintiffs seem to allege that the following actions by defendants constituted violations of the First Amendment or RLUIPA:[8]

- Search of the sweat lodge on December 19, 2017, by Morrison and other

---

[8] Despite being submitted through counsel, plaintiffs' second amended complaint lacks clarity as to the specific causes of action and the alleged violative actions.  For instance, under plaintiffs' "First Set of Facts and Cause of Action" plaintiffs allege at least 17 different actions that violated their rights under the First Amendment and/or RLUIPA.  *See* Doc. 76 at 7-13.  Because it is difficult to ascertain each and every one of plaintiffs' claims in this format, I have listed the gist of plaintiffs' complaints under each section here and acknowledge that plaintiffs have alleged additional ways their rights were violated.

employees of FDCF that caused desecration of the sweat lodge and sacred items and the temporary closure of the sweat lodge after contraband was found

- Denial of a proposal on February 27, 2018, to create an American Indian Organization[9]

- Restrictions on the use of headbands through Morrison's directive issued May 25, 2017

- The excommunication of Langdeaux from the Native American group

- The removal and destruction of the sweat lodge and certain sacred items from the Native American area at FDCF on October 17, 2019[10]

*See* Doc. 76; 96-3 at 3. Defendants' motion addresses some of plaintiffs' claims, but not all. I will limit my analysis to the claims defendants have addressed: (1) the restrictions on headbands, (2) Langdeaux's excommunication from the Native American group and (3) issues concerning the search of the sweat lodge.[11]

### A.    *Restrictions on Headbands*

Morrison issued the following directive on May 25, 2017: "Each person may have 3 bandannas only of light blue in color and must be on their property list. If bandannas are not on the property list they will be considered contraband. Bandannas will be changed to light blue through attrition." Doc. 96-2 at 3. Defendants argue that Morrison

---

[9] Plaintiffs have withdrawn this claim. *See* Doc. 96-3 at 3.

[10] Defendants' motion does not address this claim.

[11] Defendants seek summary judgment on the "role of Judy Morrison as the Native American consultant." *See* Doc. 89-1 at 15-19. I decline to address this issue because it does not challenge a specific claim by plaintiffs, that is, an action or policy by Morrison that they allege violated their religious rights. In any event, defendants merely provide historical background in this section, discussing cases involving religious consultants. There also does not appear to be any genuine dispute about the legality of the religious consultant position.

10

made a religious decision as to the color of headband that would be allowed in the prison. Doc. 89-1 at 22. They contend plaintiffs' disagreement with the decision cannot establish a violation of the First Amendment or RLUIPA. They add that considerations of gang affiliations are a compelling reason to restrict the colors of headbands that may be worn. *Id.* at 23.

Plaintiffs argue that the color of headband is extremely important to Native American religious practice as the different colors represent different spiritual matters. They state that Langdeaux has been denied the right to wear headbands at FDCF, even though he was allowed to wear headbands any time at the ISP and that IDOC policy provides that a religious accommodation allowed by one institution will follow the inmate to other institutions. Doc. 96-3 at 4-5. They also note that Kepple was denied the right to wear a yellow headband in August 2019. Kepple was purportedly informed that Morrison said it was up to the Warden to decide if headbands could be worn at FDCF. Plaintiffs argue that Morrison's statement indicates that the decision was not a religious decision.

Plaintiffs' second amended complaint raises three separate issues with regard to headbands at FDCF. First, plaintiffs allege that the bandanna policy violates plaintiffs' religious rights by requiring that the color be light blue and that all other colors be lost through attrition. Doc. 76 at 15. Second, they allege headbands may be worn at all times at the ISP and defendants have failed to justify this disparity in policy at FDCF in violation of the free exercise and establishment clauses. *Id.* at 16. Third, they allege the refusal to allow Native American offenders to wear headbands at all times violates their constitutional rights. *Id.* Defendants address only the first issue. Thus, I will not consider the second and third issues to be part of their motion.

The Eighth Circuit has explained, "we do not think that the state can be held accountable for conduct undertaken by a prison chaplain acting purely in a clerical capacity." *Montano v. Hedgepeth*, 120 F.3d 844, 851 (8th Cir. 1997). Defendants cite *Reinhart v. Haas*, 585 F. Supp. 477 (S.D. Iowa 1984), in which the court recognized the

11

importance of headbands to the Native American religion and granted a preliminary injunction enjoining defendants from prohibiting plaintiffs and other members of the Native American religion from wearing headbands at any time. *See Reinert*, 585 F. Supp. at 481. In *Reinert*, the court noted that inmates were permitted to wear religious medals or medallions, subject to approval and inspection by ISP's religious coordinator. *Id.* at 479. Following a serious riot, ISP changed its policy regarding personal clothing and mandated that only prison-issue clothing be permitted. *Id.* This was done in an effort to de-identify prison gangs. *Id.* at 481. The policy included a prohibition on headbands but the policy regarding religious medals or medallions remained in place. *Id.* at 479, 481. There was no issue of whether defendants were acting under color of state law when implementing this policy.

Here, defendants do not address plaintiffs' complaint that they are prohibited from wearing headbands at any time. Rather, they argue only that Morrison's restriction on the color of headbands was a "religious decision." I interpret defendants' use of this phrase to mean they are challenging whether Morrison was acting under color of state law in making the bandanna policy. "[T]he under-color-of-state-law element of § 1983 excludes from its reach 'merely private conduct, no matter how discriminatory or wrongful.'" *Am. Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 50 (1999) (quoting *Blum v. Yaretsky*, 457 U.S. 991, 1002 (1982)). The key inquiry is whether "the conduct allegedly causing the deprivation of a federal right [is] fairly attributable to the State." *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 937 (1982). This requires a two-step approach:

> First, the deprivation must be caused by the exercise of some right or privilege created by the State or by a rule of conduct imposed by the state or by a person for whom the State is responsible . . . . Second, the party charged with the deprivation must be a person who may fairly be said to be a state actor. This may be because he is a state official, because he has acted together with or has obtained significant aid from state officials, or because his conduct is otherwise chargeable to the State.

12

*Id.* The Court recognized these two considerations "collapse into each other when the claim of a constitutional deprivation is directed against a party whose official character is such as to lend the weight of the State to his decisions." *Id.* Employment by the state does not necessarily establish state action. *See Montano*, 120 F.3d at 848.

In *Montano*, the court considered whether a prison chaplain violated the plaintiff's rights under the First Amendment and Religious Freedom Restoration Act of 1993 by excluding him from Protestant services. *Id.* at 845. The court examined other "state actors," noting that public defenders do not act under color of state law when exercising independent professional judgment in a criminal proceeding. *Id.* at 849 (citing *Polk County v. Dodson*, 454 U.S. 312, 324 (1981)). On the other hand, prison doctors are considered state actors when engaging in the medical treatment of inmates. *Id.* (citing *West v. Atkins*, 487 U.S. 42, 51-52 (1988)). The court distinguished the two positions, noting that a prison doctor does not face the state as an adversary but works in "close cooperation" and in a "joint effort" to fulfill the state's Eighth Amendment obligation to inmates. *Id.*

In applying *Polk County* to the clergy, the court reasoned:

[W]e do not think that the state can be held accountable for conduct undertaken by a prison chaplain acting purely in a clerical capacity. Just as a public defender performs many functions which are free from the shackles of state control, a prison chaplain, although a state employee, sometimes behaves in ways which are beyond the bounds of governmental authority. In matters of faith, a pastor, probably even more so than an attorney acting on behalf of a client, is not answerable to an administrative supervisor. The teachings endorsed and practiced by recognized spiritual leaders are not, and should not be, subject to governmental pressures, and the canons which underlie most of the world's denominations are typically thought to derive from divine, rather than worldly, inspiration. As was the case in *Polk County*, this independence is memorialized in our Constitution. It is hard to imagine any greater affront to the First Amendment than a state's attempt to influence a prison chaplain's interpretation and application of religious dogma. During the course of his employment, a prison chaplain might, among many other things, deliver sermons, take confessions, grant forgiveness for sins, and counsel inmates on the proper reading of sacred

13

texts. It is peculiarly difficult to detect any color of state law in such activities.

*Id.* at 850. The court found that the role of prison chaplain fell somewhere between a public defender and prison doctor, noting it ultimately fell closer to the reasoning of *Polk County*, because there was no "joint effort" between prison officials and clergy concerning spiritual questions. *Id.* at 851, n.11. It concluded that "a prison chaplain, even if a full-time state employee, is not a state actor when he engages in inherently ecclesiastical functions (that is, when he performs spiritual duties as a leader in his church)." *Id.* at 851. The court explained that absent any showing that the chaplain relied on religious doctrine as a subterfuge and deceptively used the excommunication process to impose the will of prison administrators, it could not say that expulsion of plaintiff from the Protestant group was fairly attributable to the state. *Id.* It contrasted this with administrative and managerial tasks performed by the chaplain, which it noted would be fairly attributable to the state. *Id.*

Here, defendants cite affidavits from Morrison and the warden concerning the policy related to headband color. Morrison's affidavit provides in relevant part:

> On May 25, 2017 I set forth additional clarification to all Native American communities within the IDOC. The reason for the clarification was that there were questions by the IDOC and Native Americans as to the use and requirements for headbands. Religious clarification was provided as to the number of headbands approved offenders may possess, the colors of such headbands and where such headbands can be worn. The clarification with regard to headbands were religious decisions made by me along with the requirements of the Native American Spirituality and IDOC security.

Doc. 89-3 at 44. The warden's affidavit states Morrison provided instructions regarding the types and colors of headbands that could be worn in the IDOC and that it was a religious decision by Morrison, which the IDOC followed. *Id.* at 36.

In response, plaintiffs note that Morrison's directive was printed on State of Iowa letterhead and that she provides no indication of religious logic or meaning behind the decision. *See* Doc. 96-3 at 4. They also allege that Kepple was denied the right to wear

a yellow headband in August 2019 and when he inquired why, he was informed that Morrison stated it was up to the Warden to decide if headbands could be worn at FDCF.[12]

I agree with defendants that Morrison's decision regarding headbands/bandannas falls within the class of an "inherently ecclesiastical function" and that Morrison was not acting under color of state law in making such a decision. *See Montano*, 120 F.3d at 851. Plaintiffs' argument that there is no evidence of religious logic or meaning behind the decision misconstrues the burden of proof. Plaintiffs bear the burden of proving their claim and must come forward with some evidence to demonstrate a genuine issue of material fact on this issue to avoid summary judgment. In this instance, plaintiffs must come forward with admissible evidence from which a reasonable jury could conclude that the IDOC, or some other state actor, was the true decisionmaker with regard to colors of headbands that may be worn. Morrison's position as a religious consultant for the IDOC does not necessarily mean she acted under color of state law. *See Rendell-Baker v. Kohn*, 457 U.S. 830, 841 (1982) ("Acts of such private contractors do not become acts of the government by reason of their significant or even total engagement in performing public contracts."). It is undisputed that part of her role is to aid the IDOC and prisons in resolving difficult questions as to the operations of a particular faith within the prison environment and to serve as a resource for prison staff to answer questions on the traditions of the faith and what is needed to meet the religious obligations of the faith. *See* Doc. 89-2 at 3; Doc. 96-1 at 2. That is precisely what she did here. *See Florer v. Congregation Pidyon Shevuyim, N.A.*, 639 F.3d 916, 927 (9th Cir. 2011) ("Chaplains and religious leaders do not automatically become state actors when they provide opinions on matters of dogma in response to inquiries from prison officials."). While plaintiffs

---

[12] It is not clear from plaintiffs' additional statement of facts whether Kepple was instructed to remove his headband due to the color or the time and place during which he wore it. Based on Morrison's alleged response and because the headband policy allows for bandannas to be changed to light blue through attrition, it appears Kepple's complaint is related to a time and place restriction, which is not addressed by defendants' motion.

may not agree with her religious interpretation, that is not a matter for the court to resolve. Doing so would require the court to "determine the meaning of religious doctrine and canonical law and to impose a secular court's view of whether in the context of the particular case religious doctrine and canonical law support the decision the church authorities have made." *Scharon v. St. Luke's Episcopal Presbyterian Hospitals*, 929 F.2d 360, 363 (8th Cir. 1991). "This is precisely the kind of judicial second-guessing of decision-making by religious organizations that the Free Exercise Clause forbids." *Id.*

Defendants' motion will be granted as to plaintiffs' claim concerning restrictions on colors of headbands. As stated above, defendants' motion was silent as to the other two claims within plaintiffs' Third Set of Facts and Cause of Action (regarding restrictions on when and where headbands may be worn and a discrepancy in policies among IDOC facilities). Those issues remain for trial.

## B.    *Excommunication of Langdeaux*

Defendants argue Morrison expelled Langdeaux from the Native American group due to his behavior and, citing *Montano*, argue the decision was solely a religious decision. They argue Morrison was not a state actor in making such a decision.

Plaintiffs argue that Morrison has no authority to excommunicate Langdeaux from the Native American group and, in any event, did so because she opposes Langdeaux's gender identity. Langdeaux is "Two-Spirited (gender fluid)." Doc. 96-2 at 5.[13] Langdeaux also argues he is a follower of The Heyoka Society, and because Morrison is not, she is not qualified to render spiritual assistance to Langdeaux and is not a recognized spiritual leader of the relevant faith (Sioux or The Heyoka Society). *See* Doc. 96-3 at 17. Plaintiffs cite *Bear v. Nix*, in which an inmate who had previously been allowed to participate in Native American ceremonies was barred from participation based on a

---

[13] Plaintiffs do not allege in their second amended complaint that Morrison excommunicated Langdeaux based on his gender identity. *See* Doc. 76 at 17-18.

change in policy under which only inmates with a BIA enrollment number could participate and the Native American consultant had complete discretion over who could participate in Native American religious activities. *Bear v. Nix*, 977 F.2d 1291, 1292 (8th Cir. 1992). The court held that a religious consultant's excommunication of a member "represent[ed] an application of religious doctrine by a recognized spiritual leader of the relevant faith." *Id.* at 1294. Plaintiffs emphasize that the *Bear* court recognized that the plaintiff in that case did not allege that the consultant's decision "resulted from malice, bad faith, or unconstitutional motive," *id.* at 1294, and note that Morrison, in contrast, opposes Langdeaux's gender identity and is not a recognized spiritual leader of Langdeaux's relevant faith.

To the extent Langdeaux argues his constitutional rights are being violated because Morrison is an insufficient religious advisor for Langdeaux's specific faith (The Heyoka Society or Sioux), or that she is unqualified to expel him from the Native American group for this reason, plaintiffs do not raise these claims in their second amended complaint. As such, they are not properly part of this case. *See Wendt v. Iowa*, 971 F.3d 816, 820-21 (8th Cir. 2020) (concluding district court properly refused to consider a claim not pleaded in a complaint but raised for the first time in response to a motion for summary judgment). For the same reason, I will not consider Langdeaux's argument that the true reason Morrison expelled him from the Native American group is due to his gender identity.

The remaining issue is whether Morrison was engaged in an "inherently ecclesiastical function" when she excommunicated Langdeaux from the Native American group. *See Montano*, 120 F.3d at 851. Defendants assert Langdeaux's expulsion was due to his behavior. *See* Doc. 89-2 at 9. Plaintiffs admit Langdeaux was expelled from the Native American group because "he disagreed with her" and deny that the reason was based on any religious factor. *See* Doc. 96-1 at 7. Whether based on his behavior or a disagreement with Morrison is not material. This issue is governed by *Montano*. In that case, the Eighth Circuit concluded the prison chaplain's decision to exclude an inmate

17

from Protestant services was an "inherently ecclesiastical function." *Montano*, 120 F.3d at 851. It noted there was no evidence that the chaplain used religion as a subterfuge to carry out a directive of prison administrators. There is similarly no such evidence here.

While plaintiffs allege that Morrison's decision was based on factors unrelated to religion, that matter is inappropriate for the court to consider in the absence of evidence that the decision was guided by state officials. Doing so would require the court to "determine the meaning of religious doctrine and canonical law and to impose a secular court's view of whether in the context of the particular case religious doctrine and canonical law support the decision the church authorities have made." *Scharon*, 929 F.2d at 363. Again, "[t]his is precisely the kind of judicial second-guessing of decision-making by religious organizations that the Free Exercise Clause forbids." *Id.* Because Langdeaux challenges Morrison's decision to exclude him from the Native American community and Morrison is the Native American consultant, her decision, in the absence of evidence that it was directed by state officials, amounts to an "inherently ecclesiastical function." *See Montano*, 120 F.3d at 851. As such, defendants' motion will be granted with regard to Langdeaux's excommunication from the Native American group.

## C.     *Search of Sweat Lodge, Identification of Contraband and Temporary Closure of the Sweat Lodge and Access to Sacred Items*

Plaintiffs' second amended complaint raises several issues with regard to the sweat lodge in two separate causes of action. In the first cause of action, they allege the following actions by defendants violated their religious rights: the search of the sweat lodge, the identification (or misidentification) of contraband, the temporary closure of the sweat lodge for approximately 30 days after the search and the desecration of the sweat lodge and sacred objects and subsequent refusal to re-consecrate these items. *See* Doc. 76 at 7-13. They allege that after the search of the sweat lodge on December 19, 2017, Morrison issued an order to FDCF officials making the sweat lodge area and sacred items unavailable to the Native American community. On January 16, 2018, Morrison

and FDCF officials held a meeting with the Native American community. During the approximate 30-day interim, plaintiffs allege they could not perform any ceremony in observance of their religious beliefs. *Id.* at 9. At the meeting, the Native American community was verbally reprimanded to take better care of the sweat lodge, grounds and their religious items. They were permitted to return to their religious practice at this time. *Id.* at 8.

When asked why the sweat lodge had been closed, plaintiffs allege that Morrison told them she had discovered wooden items hidden in the locked storage shed, which she classified as weapons and identified as contraband. Plaintiffs allege these were wooden sticks that had been donated by FDCF as raw materials for the future construction of sacred drumsticks. *Id.* at 8-9. They contend Morrison violated their rights by inappropriately deeming the wooden sticks "weapons" and making the sweat lodge and sacred items off limits for 30 days.

Plaintiffs complained that the sweat lodge grounds and items had been desecrated by the search because Morrison did not observe the distinction between male and female sacred objects and touched items used by men. Also, according to their Native identification cards issued by the IDOC, staff is prohibited from touching any sacred item. *Id.* at 10. Plaintiffs asked for the sweat lodge grounds and sacred objects to be re-consecrated by a spiritual leader. *Id.* at 9-11. This request was denied and plaintiffs allege the sweat lodge grounds and items remain unused. *Id.* at 11. They contend that being forced to choose between refraining from religious practices and practicing on desecrated grounds is a violation of their rights under the First Amendment and RLUIPA. *Id.* at 11-12. Plaintiffs raise additional issues within this cause of action such as Morrison's alleged animus and slander towards Sioux people and the requirements she imposes for participation in Native American religious events. Defendants do not address these issues in their motion.

19

In their fifth cause of action, plaintiffs allege that on October 17, 2019,[14] defendants directed, acquiesced in, removed and/or destroyed sacred objects, including but not limited to, the sweat lodge, the buffalo skull altar, pipes and other objects. Doc. 76 at 18. They allege the removal and/or destruction of sacred objects violated their rights under the First Amendment and RLUIPA and was done in retaliation for exercising their religious rights.

Defendants' motion is limited in scope as it addresses only the search and temporary closure of the sweat lodge pending investigation into the discovered contraband. *See* Doc. 89-1 at 24-26. They argue that upon discovering contraband in the Native American area at FDCF, Morrison made the religious decision that the area, and all religious items therein, should be closed to the Native American offenders until an investigation could be completed. Doc. 89-1 at 24. Defendants note there was agreement with this decision from a prison operations standpoint. *Id*. They argue that the search and closure of the area pending an investigation was a reasonable response by prison officials. *Id*. at 26. Defendants do not address other allegations including the desecration of sacred objects (including the sweat lodge, buffalo skull altar, pipes and other objects), refusal to re-consecrate those items or any of the allegations contained in the fifth cause of action. As such, I consider these claims, and any others not addressed by defendants' motion, intact and will not address plaintiffs' arguments concerning those matters.

Plaintiffs disagree that the decision to remove contraband was a religious one. They admit that preventing the possession of contraband is a legitimate security concern but deny that "contraband" was found here. They also argue that closure[15] of the sweat

---

[14] While the second amended complaint does not provide the year, plaintiffs state in their additional statement of facts that the sweat lodge was removed in October 2019. See Doc. 96-1 at 13.

[15] Because defendants do not address the issue of the permanent closure or removal of the sweat lodge in October 2019, I will consider only the temporary 30-day closure.

20

lodge was not the least restrictive means for dealing with the problem of finding contraband on one occasion. Plaintiffs note that defendants offer no details about the purported investigation and its results, if any. Plaintiffs state the least restrictive means of addressing problems with contraband would be: (1) removal of contraband, (2) a reminder to the users of the sweat lodge not to keep contraband at the sweat lodge and re-education as to what items constitute contraband, and (3) periodic searches for contraband of the sweat lodge in the presence of an authorized Native American offender. *See* Doc. 96-3 at 8-14.

"[W]hen faced with both a Free Exercise claim and a RLUIPA claim, a court must, as a threshold matter, inquire as to whether the prison has placed a 'substantial burden' on the prisoner's ability to practice his religion." *Gladson v. Iowa Dept. of Corrections*, 551 F.3d 825, 833 (8th Cir. 2009) (quoting *Patel v. U.S. Bureau of Prisons*, 515 F.3d 807, 813 (8th Cir. 2008)). "Once it is determined that a regulation imposes a substantial burden on a prisoner, the review of that burden under the Free Exercise Clause differs from [ ] RLUIPA." *Id.* To substantially burden one's free exercise of religion means the regulation or action:

> must significantly inhibit or constrain conduct or expression that manifests some central tenant of a person's individual religious beliefs; must meaningfully curtail a person's ability to express adherence to his or her faith; or must deny a person reasonable opportunities to engage in those activities that are fundamental to a person's religion.

*Murphy v. Mo. Dep't of Corr.*, 372 F.3d 979, 988 (8th Cir. 2004). "If the prisoner fails to put forth sufficient evidence that his ability to practice his religion has been substantially burdened, then the court need not apply the *Turner* test to the Free Exercise claim and the strict scrutiny test to the RLUIPA claim." *Gladson*, 551 F.3d at 833.

To begin, I agree with plaintiffs that the search, identification of contraband and temporary closure of the Native American area were not religious decisions, as argued by defendants, or the exercise of an "inherently ecclesiastical function." *Montano*, 120 F.3d at 851. Rather, they are administrative or managerial tasks that are "fairly

attributable to the state." *Id*. Next, I must consider whether the search, the identification of contraband or the 30-day prohibition of access to the sweat lodge and sacred items placed a "substantial burden" on plaintiffs' ability to exercise their religion.

I find that plaintiffs have not set forth sufficient evidence to demonstrate a genuine issue of material fact as to whether the alleged misidentification of the wooden sticks as contraband imposed a substantial burden on their religious practice. Plaintiffs were already practicing their religion without the wooden sticks, which were locked in a storage shed and, according to plaintiffs, were intended to be made into sacred drumsticks at some future date. They have offered no evidence suggesting how designation of these items as contraband is a substantial burden to their religious practice. Therefore, I need not analyze the issue further. *See Gladson*, 551 F.3d at 833.

Plaintiffs allege that the approximate 30-day closure of the sweat lodge was punitive and placed a substantial burden on the exercise of their religious rights. Plaintiffs have not identified specific evidence demonstrating that they otherwise would have used the sweat lodge within that time period – such as evidence of a schedule of their sweat lodge ceremonies or evidence demonstrating their religious practice required use of the sweat lodge during the 30-day closure. Their only evidence, which is not identified in a statement of additional fact but appears in the appendix (Doc. 96-2), is a grievance form from Bauer in which he states that closure of the sweat lodge "coincided with a significant memorial observance in December" known as "The Dakota 38+2." *See* Doc. 96-2 at 15. While somewhat scant, I find that this evidence is sufficient to demonstrate a genuine issue of material fact as to whether the 30-day closure of the sweat lodge imposed a "substantial burden" on plaintiffs' religious practice. However, defendants are nonetheless entitled to summary judgment if they satisfy the *Turner* test with regard to the First Amendment free exercise claim and strict scrutiny as to the RLUIPA claim. *See Gladson*, 551 F.3d at 833.

Under *Turner*, a prison regulation or action is valid, even if it restricts a prisoner's constitutional rights, if it is "reasonably related to legitimate penological interests."

*Turner v. Safley*, 482 U.S. 78, 89 (1987). The four factors the court must consider in making that determination are:

- Whether there is a "'valid, rational, connection' between the prison regulation and the legitimate governmental interest put forward to justify it."

- Whether there are "alternative means of exercising the right that remain open to prison inmates"

- "[T]he impact accommodation of the asserted constitutional right [would] have on guards and other inmates, and on the allocation of prison resources generally"

- "[T]he absence of ready alternatives" as "evidence of the reasonableness of a prison regulation"

*Id.* at 89-91. Under RLUIPA, defendants must prove the regulation or action is "the least restrictive means to further a compelling interest." *Singson v. Norris*, 553 F.3d 660, 662 (8th Cir. 2009) (quoting *Murphy*, 372 F.3d at 988). Thus, a free exercise claim under RLUIPA is subject to a higher standard of review than a free exercise claim under the First Amendment. *See Murphy*, 372 F.3d at 986.

Defendants have not demonstrated they are entitled to judgment as a matter of law under either test. Defendants cite "security concerns" associated with the contraband items but give no explanation about the length of the closure or their investigation. *See* Doc. 89-1 at 26 ("In short, the fact that a religious area was searched and determined to have contraband is a serious concern – for which the prison officials responded reasonably by completing a further investigation."). *See also id.* at 12 (explaining Morrison decided to lock down the area and all sacred items from Native Americans to secure the area and determine the extent of the problem). While institutional security has been deemed a compelling interest and prison officials have "wide latitude within which to make appropriate limitations," they "must do more than offer conclusory statements and post hoc rationalizations for their conduct." *Murphy*, 372 F.3d at 988-89 (quoting *Hamilton v. Schriro*, 74 F.3d 1545, 1554 (8th Cir. 1996)); *see also Werner v. McCotter*, 49 F.2d

23

1476, 1480 (10th Cir. 1995) ("[E]ven within the prison context, the state must do more than simply offer conclusory statements that a limitation on religious freedom is required for security, health or safety in order to establish that its interests are of the highest order."). Defendants have failed to go beyond making conclusory statements. As such, summary judgment as to this claim must be denied.

With regard to the search itself, plaintiffs acknowledge that such searches are permissible, but contend this particular search violated their rights because it was not done in the presence of a Native American offender and involved Morrison and staff touching items, both of which resulted in the desecration of those items. This argument is part of plaintiffs' larger claim that they cannot sufficiently practice their religion with desecrated items and because Morrison has refused to re-consecrate the area and items, they are forced to choose between practicing in a desecrated area or not practicing at all. Because defendants do not address that argument in their motion, this claim is reserved for trial.

Defendants' motion is granted with respect to plaintiffs' claim that the identification of contraband violated their rights under the First Amendment and RLUIPA. It is denied as to plaintiffs' claim that the temporary closure of the sweat lodge violated those rights. All other claims within the first cause of action and fifth cause of action not addressed by defendants' motion will proceed to trial.

## VI.   CONCLUSION

For the foregoing reasons:

1.      Defendants' motion (Doc. 89) for summary judgment is **granted** as to plaintiffs' claims alleging First Amendment and RLUIPA violations based on: (1) restrictions on colors of headbands, (2) Langdeaux's excommunication from the Native American group and (3) the identification of wooden sticks as contraband. Those claims are **dismissed**.   The motion (Doc. 89) for summary judgment is **denied** in all other respects.

2.      To the extent Langdeaux argues his constitutional rights are being violated because (1) Morrison is an insufficient religious advisor for Langdeaux's specific faith, (2) Morrison is unqualified to expel him from the Native American group or (3) Morrison expelled him from the Native American group due to his gender identity, I find that those claims are not properly part of this case because they are not included in plaintiffs' second amended complaint (Doc. 76). Those claims will not proceed to trial.

3.      All properly-pleaded claims not dismissed or disposed of as a result of this order remain pending for trial. As suggested throughout this order, however, the scope and extent of those claims is not entirely clear. As such:

a.      On or before **February 1, 2021**, plaintiffs shall file a notice listing all claims that they contend are properly before the court for trial in light of (i) this order and (ii) their second amended and substituted complaint (Doc. 76).

b.      On or before **February 11, 2021**, defendants shall file a response to plaintiffs' notice, indicating for each listed claim their position as to whether it is, or is not, properly before the court for trial in light of (i) this order and (ii) the second amended and substituted complaint (Doc. 76).

c.      After reviewing the parties' filings, I will determine whether it is necessary to schedule a hearing to address any disputes as to which claims remain pending for trial.


**IT IS SO ORDERED.**

**DATED** this 20th day of January, 2021.


_____
Leonard T. Strand, Chief Judge