IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
CENTRAL DIVISION

| | |
|---|---|
| LAWRENCE TYNDALL et al., <br><br> Plaintiffs, <br><br> vs. <br><br> STATE OF IOWA, et al., <br><br> Defendants. | No. C18-3025-LTS <br><br> **MEMORANDUM OPINION AND ORDER ON DEFENDANTS' SUPPLEMENTAL MOTION FOR SUMMARY JUDGMENT** |

## I. INTRODUCTION

This case is before me on a supplemental motion (Doc. 109) for summary judgment filed by defendants Fort Dodge Correctional Facility (FDCF), Don Harris, Iowa Department of Corrections (IDOC), the State of Iowa, Robert Johnson and Judy Morrison (defendants). Plaintiffs have filed a resistance (Doc. 112) and defendants have filed a reply (Doc. 113). Oral argument is not necessary. *See* Local Rule 7(c).

## II. PROCEDURAL HISTORY

Plaintiffs commenced this action pro se on April 3, 2018. They allege defendants have violated their religious rights under the Religious Land Use and Institutionalized Persons Act (RLUIPA), 42 U.S.C. §2000cc, and, pursuant to 42 U.S.C. § 1983, their constitutional rights under the First Amendment's free exercise of religion clause, U.S. Const., amend. I. Doc. 1. They seek declaratory and injunctive relief, compensatory damages and punitive damages. *Id.* at 14.

On April 17, 2019, plaintiffs filed an amended complaint (Doc. 31). I granted plaintiffs' motion to appoint counsel on August 19, 2019. *See* Doc. 65. Plaintiffs then filed, through counsel, another motion (Doc. 74) to amend their complaint. That motion

was granted. Doc. 75. Plaintiffs filed their second amended complaint (Doc. 76) on January 13, 2020, and defendants filed their answer (Doc. 77) on January 27, 2020.

I granted in part and denied in part defendants' previous motion (Doc. 89) for summary judgment. *See* Doc. 97. I granted summary judgment as to plaintiffs' claims concerning: (1) restrictions on colors of headbands, (2) plaintiff Langdeaux's excommunication from the Native American group and (3) the identification of wooden sticks as contraband. Those claims were therefore dismissed. *Id.* at 24.

I denied the motion in all other respects. In accordance with the summary judgment ruling, the parties filed notices regarding the claims they believe remained for trial. Plaintiffs identified the following eight claims:

1. Disparity in policy between Iowa State Penitentiary (ISP) allowing headbands to be worn at all times and FDCF policy limiting headband use

2. Refusal to allow Native American offenders to wear headbands at all times

3. Search of the sweat lodge on December 19, 2017

4. Closure of the sweat lodge

5. Desecration of the sweat lodge and sacred objects contained therein and subsequent refusal to re-consecrate those items

6. Morrison's racial animus towards the Sioux people

7. Morrison's discrimination regarding proof of heritage between those of North American and South American ancestry

8. Destruction of the sweat lodge on October 17, 2019

Doc. 98. Defendants agree that the second, third, fourth, fifth, and eighth claims were raised in the second amended complaint and were not dismissed by the previous summary judgment order. *See* Doc. 99. Nonetheless, they address six issues in their current, supplemental motion for summary judgment: headbands, search of the Native American

area, temporary closure of the sweat lodge, desecration of the sweat lodge, the sweat lodge reopening and statements as to Sioux people. *See* Doc. 109-1.

Plaintiffs seek the following relief in the second amended complaint:

1. Declare that plaintiffs' religious beliefs are sincerely held;

2. Declare that defendants have violated plaintiffs' sincerely held beliefs;

3. Declare that defendants' actions impose substantial burdens on plaintiffs' religious practice without compelling government interests;

4. Declare that defendant State of Iowa, DOC, and FDCF impose substantial burdens on plaintiffs' religious exercise through improper and excessive deference to defendant Morrison;

5. Issue an injunction requiring that defendants provide a qualified religious leader other than defendant Morrison to consecrate the sweat lodge grounds and items so that plaintiffs may continue their religious exercise;

6. Issue an injunction enjoining and restraining defendants from prohibiting plaintiffs and other inmate adherents of the NAR from wearing headbands at any time;

7. Issue an injunction enjoining and restraining defendants from restricting headband use to only headbands of light blue in color;

8. Issue an injunction enjoining and restraining defendants from prohibiting plaintiffs from seeking the services of a recognized Native American spiritual leader and from prohibiting him entry into the institution for consultation with the Native American community and reconsecration of sacred grounds and items;

9. Award compensatory damages against each defendant for plaintiffs' emotional and other injuries, and punitive damages against each defendant;

10. Award attorney fees, and

11. Grant plaintiffs such other relief as it may appear plaintiffs are entitled to.

Doc. 76 at 19-20.

On October 22, 2021, I granted plaintiffs' unresisted motion for continuance of the trial and reset the summary judgment motion deadline. *See* Doc. 107. Trial is scheduled for June 13, 2022.

### III. SUMMARY JUDGMENT STANDARD

Any party may move for summary judgment regarding all or any part of the claims asserted in a case. Fed. R. Civ. P. 56(a). Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

A material fact is one that "'might affect the outcome of the suit under the governing law.'" *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Thus, "the substantive law will identify which facts are material." *Id.* Facts that are "critical" under the substantive law are material, while facts that are "irrelevant or unnecessary" are not. *Id.*

An issue of material fact is genuine if it has a real basis in the record, *Hartnagel v. Norman*, 953 F.2d 394, 395 (8th Cir. 1992) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986)), or when "'a reasonable jury could return a verdict for the nonmoving party' on the question." *Woods v. DaimlerChrysler Corp.*, 409 F.3d 984, 990 (8th Cir. 2005) (quoting *Anderson*, 477 U.S. at 248). Evidence that only provides "some metaphysical doubt as to the material facts," *Matsushita*, 475 U.S. at 586, or evidence that is "merely colorable" or "not significantly probative," *Anderson*, 477 U.S. at 249–50, does not make an issue of material fact genuine.

As such, a genuine issue of material fact requires "sufficient evidence supporting the claimed factual dispute" so as to "require a jury or judge to resolve the parties' differing versions of the truth at trial." *Anderson*, 477 U.S. at 248–49. The party moving for entry of summary judgment bears "the initial responsibility of informing the court of

4

the basis for its motion and identifying those portions of the record which show a lack of a genuine issue." *Hartnagel*, 953 F.2d at 395 (citing *Celotex*, 477 U.S. at 323). Once the moving party has met this burden, the nonmoving party must go beyond the pleadings and by depositions, affidavits, or otherwise, designate specific facts showing that there is a genuine issue for trial. *Mosley v. City of Northwoods*, 415 F.3d 908, 910 (8th Cir. 2005). The nonmovant must show an alleged issue of fact is genuine and material as it relates to the substantive law. If a party fails to make a sufficient showing of an essential element of a claim or defense with respect to which that party has the burden of proof, then the opposing party is entitled to judgment as a matter of law. *Celotex*, 477 U.S. at 322.

In determining if a genuine issue of material fact is present, I must view the evidence in the light most favorable to the nonmoving party. *Matsushita*, 475 U.S. at 587–88. Further, I must give the nonmoving party the benefit of all reasonable inferences that can be drawn from the facts. *Id.* However, "because we view the facts in the light most favorable to the nonmoving party, we do not weigh the evidence or attempt to determine the credibility of the witnesses." *Kammueller v. Loomis, Fargo & Co.*, 383 F.3d 779, 784 (8th Cir. 2004). Instead, "the court's function is to determine whether a dispute about a material fact is genuine." *Quick v. Donaldson Co., Inc.*, 90 F.3d 1372, 1376–77 (8th Cir. 1996).

### IV. RELEVANT FACTS

The following facts are undisputed except where noted otherwise:

Dustin Nielsen and James Langdeaux are the only two plaintiffs remaining at FDCF. All other plaintiffs have either been released from prison or been transferred out of FDCF. Offenders at FDCF are allowed to wear religious head items within their cells, at religious services and when going to and from religious services. Offenders are not allowed to wear religious head items on other occasions outside their cells, such as during meals, exercise or work. FDCF cites gang issues as its rationale for this policy and states

that gang activity is present at FDCF.

Morrison is the Native American consultant for IDOC. She assists all IDOC prisons and staff in understanding and implementing the basic requirements for Native Americans by serving as a consultant for any Native American issues that may arise in the IDOC. She also serves as the consultant for all the Native American communities that exist in the IDOC. Therefore, her role is twofold – making sure the IDOC provides appropriate services to Native American offenders and helping such offenders in their spirituality. She regularly visits all IDOC institutions as part of her duties.

Several issues have arisen at FDCF concerning Native American religious practices. One of those issues – when and where headbands may be worn in the institution – was never brought to Morrison's attention. Defendants maintain that headbands present a security issue while plaintiffs contend FDCF's policy violates their religious rights.

The second issue concerns a search of the Native American area on December 19, 2017. Morrison routinely searches the Native American areas at all the prisons to ensure that only the proper items are retained in storage (plaintiffs deny this statement for lack of information). The parties agree that Morrison conducted the search at issue while FDCF staff merely observed. The reason for not allowing staff to perform the search is that they do not know which items are allowed, how to recognize the items and which items they are prohibited from touching, moving or causing to be moved.

The third issue involves a lockdown of the Native American area after Morrison's search. The lockdown decision was based on security concerns rather than religious reasons. Defendants state the lockdown lasted for approximately two weeks, during which time Native American ceremonies were not allowed. There were no holidays or other religious events during this time. Plaintiffs dispute these facts, stating that their inability to use the sweat lodge and its sacred objects lasted longer than two weeks due to the desecration of the sweat lodge and the sacred objects by Morrison during the search. They state that defendants removed the sweat lodge in October 2019. Plaintiffs do not address whether there were any religious events during the lockdown period.

The parties dispute the alleged desecrating act. Defendants state that the plaintiffs' apparent concern "is that females who participate in the search, are on their 'moon' (actively menstruating) – which they believe will desecrate the area." Doc. 109-2 at ¶ 39. Plaintiffs state their concern is that no female may touch sacred objects reserved for males. They note that FDCF policy requires that any searches of sacred spaces must be made in the presence of a knowledgeable Native American offender who touches the sacred items under the direction of staff.

The parties dispute whether the Native American area was desecrated by the presence of a female. During the lockdown, offenders complained of the alleged desecration. They deny they were asked if there was someone they wanted to come into the prison to help open the area for ceremony. Defendants state the area was open within approximately two weeks after the initial discovery of the contraband. Plaintiffs dispute this, citing the alleged desecration. Defendants state the area has remained open following the investigation and normal operations have returned. They state the sweat lodge was rebuilt and the men are holding ceremony. Plaintiffs also dispute these statements, citing the alleged desecration and noting the sweat lodge was removed in October 2019.

## V.  DISCUSSION

Defendants argue they are entitled to judgment as a matter of law because there is no viable claim for relief for three reasons: (1) any claim for injunctive relief is moot as to any offenders not currently at FDCF; (2) any claim for damages must be denied as the plaintiffs have not (and cannot) allege a "physical injury" as required by 42 U.S.C. § 1997e and (3) there is no evidence of malice required for punitive damages to be considered. Even if I consider the merits, defendants argue there is no evidence of a constitutional violation related to the issues of headbands, search of the Native American area, closure of the sweat lodge, desecration of the sweat lodge, re-opening of the sweat lodge and Morrison's statements as to Sioux offenders.

7

Plaintiffs agree that, based on *Smith v. Hundley*, 190 F.3d 852 (8th Cir. 1999), plaintiffs Lawrence Tyndall, Trey Redowl, Bryon Bauer, Harold Thomas, Damon Calaway, Raymond Cooper, Zachary Ramirez and Cody Kepple are no longer at FDCF and lack standing. They dispute that Langdeaux lacks standing but agree that Nielsen remains incarcerated at FDCF and has standing with respect to the claims raised for injunctive and declaratory relief. Plaintiffs agree that none of them suffered any physical injury to support a claim for emotional distress damages under 42 U.S.C. § 1997e and that there is insufficient evidence to support punitive damages. Plaintiffs are no longer pursuing their claim that Morrison made disparaging comments regarding certain Sioux offenders. I will address Langdeaux's standing before addressing plaintiffs' remaining claims.

### A.     *Does Langdeaux Have Standing?*

In my previous order on defendants' motion for summary judgment, I considered whether Langdeaux's excommunication from the Native American group was a religious decision such that Morrison was not a state actor in making such a decision. *See* Doc. 97 at 16-18. I determined that, in the absence of evidence that Morrison's decision to excommunicate Langdeaux was directed by state officials, her decision amounted to an "inherently ecclesiastical function" under *Montano v. Hedgepeth*, 120 F.3d 844, 851 (8th Cir. 1997). Without state action, Langdeaux's § 1983 claim based on his excommunication failed as a matter of law. Plaintiffs argue that Langdeaux has standing as to the remainder of their claims because there is no dispute that he qualifies as Native American and has sincerely held religious beliefs as a Native American. Defendants interpret my prior ruling as meaning Langdeaux is no longer being a party to the action.

I do not have sufficient information to determine whether Langdeaux has standing. While I have determined he may not challenge his excommunication from the Native American group under § 1983, I have not determined whether he may challenge the other alleged violations. As to that issue, I have no information regarding which Native

8

American practices, if any, Langdeaux is being allowed to participate in as an excommunicated member. Is he still permitted to wear a headband? Is he permitted to access the sweat lodge? Neither party offers any evidence as to these issues.

Langdeaux is not the only remaining plaintiff at FDCF. Because Nielsen is a member of the Native American group and remains at FDCF, I will address plaintiffs' remaining claims. Based on the lack of available evidence. I make no decision on the issue of whether Langdeaux has standing for such claims.

### B.  *Restrictions on Headbands*

Defendants argue FDCF has a headband policy based on security concerns over gang issues. The policy is that offenders may wear religious head items within their cells, at religious services and when coming or going from religious services. They are not allowed to wear religious head items at other times while outside their cell, such as at meals or during exercise or work. Defendants state that gang activity is present at FDCF and there is a security concern over religious head items being used to identify membership in a gang. Pursuant to *Rogers v. Scurr*, 676 F.2d 1211, 1216 (8th Cir. 1982), defendants request that the court defer to the discretion of the prison officials.

Plaintiffs cite *Reinert v. Haas*, 585 F. Supp. 477 (S.D. Iowa 1984), in which the court held that Native American inmates at ISP could not be prohibited from wearing headbands at any time or place within the institution. Plaintiffs assert that the existence of different policies at different IDOC facilities raises equal protection concerns.[1] They note that *Reinert* involved a similar policy based on similar concerns of gang activity. Plaintiffs argue *Rogers* does not apply because the policy in that case was aimed at preventing the concealment of contraband. Plaintiffs contend that FDCF's policy

---

[1] Plaintiffs do not assert a violation of the equal protection clause of the 14th Amendment of the United States Constitution in association with this claim in their second amended complaint. The only reference to equal protection in the second amended complaint is in count two, alleging denial of a proposal for a secular American Indian Organization. *See* Doc. 76 at 13-14. Plaintiffs subsequently withdrew that claim. *See* Doc. 96-3 at 3.

9

conflicts with IDOC's policy that a religious accommodation allowed at one institution will follow the offender to other institutions. Langdeaux and Nielsen were allowed to wear headbands at any time at ISP and have been denied that right at FDCF.

Plaintiffs' allegations concerning the time and place restrictions on headbands are contained under the "Third Set of Facts and Cause of Action" in their second amended complaint. Doc. 76 at 14-17. Plaintiffs allege that defendants' failure to justify the disparity in religious practice between ISP and FDCF violates the "Free Exercise and Establishment Clauses." *Id.* at 16. They do not allege a violation of RLUIPA or other constitutional violations as to this claim.[2]

"Section 1983 provides a remedy against any person who, under color of state law, deprives another of rights protected by the Constitution." *Collins v. City of Harker Heights*, 503 U.S. 115, 120 (1992) (internal quotation marks omitted). The First Amendment, which applies to the states through the due process clause of the Fourteenth Amendment, *see Cantwell v. Connecticut*, 310 U.S. 296, 303 (1940), provides that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof . . . ." U.S. Const. amend I. "[P]rison regulations alleged to infringe constitutional rights are judged under a 'reasonableness' test less restrictive than that ordinarily applied to alleged infringements of fundamental constitutional rights." *O'Lone v. Estate of Shabazz*, 482 U.S. 342, 349 (1987).

As an initial matter, plaintiffs must first demonstrate that the policy at issue substantially burdens their sincerely held religious beliefs. *See Gladson v. Iowa Dept. of Corr.*, 551 F.3d 825, 832-33 (8th Cir. 2009). "[W]hen a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests." *Id.* (quoting *Turner v. Safley*, 482 U.S. 78, 89 (1987)). Courts

---

[2] While plaintiffs' second amended complaint generally alleges violations of the First, Sixth, Eighth and Fourteenth Amendments of the United States Constitution, RLUIPA and the Articles of the United Nations Convention against torture, *see* Doc. 76 at ¶¶ 1, 23, plaintiffs identify specific constitutional or statutory provisions throughout the complaint as they discuss each claim.

10

employ a four-factor test to determine whether a regulation is reasonable: (1) whether there is a "valid rational connection" between the prison regulation and the government interest justifying it; (2) whether there is any alternative means for exercise of the asserted right; (3) whether an accommodation would have "a significant ripple effect" on the guards, other inmates and prison resources and (4) whether there is an alternative that fully accommodates the prisoner "at de minimis cost to valid penological interests." *Murphy v. Mo. Dep't of Corr.*, 372 F.3d 979, 982-83 (8th Cir. 2004).

There are no genuine issues of material fact as to this issue. Rather, the parties dispute whether defendants are entitled to judgment as a matter of law based on the undisputed facts. Because the parties rely on *Reinert* and *Rogers*, I will discuss those cases first.

In *Reinert*, the court recognized the importance of headbands to the Native American religion and granted a preliminary injunction enjoining defendants from prohibiting plaintiffs and other members of the Native American religion from wearing headbands at any time. *See Reinert*, 585 F. Supp. at 481. ISP allowed inmates to wear religious medals or medallions, subject to approval and inspection by ISP's religious coordinator. *Id.* at 479. Following a serious riot, ISP changed its policy regarding personal clothing and mandated that only prison-issue clothing be permitted. *Id.* This was done in an effort to de-identify prison gangs. *Id.* at 481. The policy included a prohibition on headbands but allowed other religious medals or medallions. *Id.* at 479, 481. The court granted a preliminary injunction, finding that the restrictions appeared to violate plaintiffs' right of free exercise of religion and to discriminate against their religion. *Id.* at 481.

In *Rogers*, the plaintiffs, who were member of the Islamic faith, asserted a violation of their First Amendment rights to freely exercise religion for various reasons while incarcerated at two different Iowa prisons. *Rogers*, 676 F.2d at 1212. The district court found that a prohibition on allowing plaintiffs to wear prayer caps and robes outside prayer services was a "reasonable method of preventing the concealment of contraband,"

11

but ordered officials to adopt a less restrictive alternative. *Id.* at 1215. The Eighth Circuit noted that "[i]nmates retain those First Amendment rights not inconsistent with their status as prisoners or with penological objectives of the corrections system." *Id.* (quoting *Pell v. Procunier*, 417 U.S. 817, 822 (1974)). While the court agreed that limitations on religious rights should be no greater than necessary to protect the governmental interest involved, it concluded "prison officials ordinarily must have wide latitude within which to make appropriate limitations" "especially when the maintenance of institutional security is at issue." *Id.* The court concluded the purpose of the policy (preventing the concealment of contraband) was reasonable. *Id.* The court rejected the district court's suggestion of allowing robes and caps to be worn at all times and granting the prison officials' right to search individuals wearing such clothing at any reasonable time. It stated the court "should not substitute its judgment for that of the officials who run penal institutions." *Id.* (citing *Bell v. Wolfish*, 441 U.S. 520, 544 (1979)).

As noted above, plaintiffs must demonstrate that a genuine issue of material fact as to whether the policy places a substantial burden on their ability to practice their religion. *Patel*, 515 F.3d at 813. Because neither party addresses this issue, and defendants seek summary judgment based on giving deference to the discretion of the prison officials, I will assume for purposes of summary judgment that plaintiffs have met the substantial burden requirement.

Neither party has addressed any of the *Turner* factors. Under the first *Turner* factor, the prison bears the burden of proving the existence of a "rational connection" between the challenged regulation and a legitimate government interest. *Murchison v. Rogers*, 779 F.3d 882, 887-88 (8th Cir. 2015). The government interest must be legitimate and applied in a neutral fashion. *Turner*, 482 U.S. at 98-99. The court should give "great deference to the judgment and expertise of prison officials, particularly with respect to decisions that implicate institutional security." *Murphy*, 372 F.3d at 982-83. If there is a valid rational connection, the court balances the three remaining factors. *See Simpson v. Cnty. of Cape Girardeau, Mo.*, 879 F.3d 273, 279 (8th Cir. 2018).

12

FDCF's policy is based on security concerns related to gang identification and affiliation, noting that gang activity is an issue at FDCF. There is no evidence that the policy is not applied neutrally, distinguishing it from the policy in *Reinert*. The Eighth Circuit has recognized institutional security as the most compelling government interest in a prison setting. *Id.* (citing *Murphy*, 372 F.3d at 983). The prevention of gang activity has also been recognized as a legitimate security interest. *See Turner*, 482 U.S. at 92. "[P]rison officials need only show that the regulated practice creates a *potential* threat to institutional security." *Butler-Bey v. Frey*, 811 F.2d 449, 451 (8th Cir. 1987) (emphasis in original). Defendants explain that items that identify membership in a group, such as headbands, could be used to signify membership in a gang and that gang activity is present at FDCF. Doc. 109-3 at 4. Based on the undisputed facts, the policy has a "valid rational connection" to the government interest under the first *Turner* factor.

The remaining *Turner* factors are: (1) whether there is any alternative means for exercise of the asserted right, (2) whether an accommodation would have "a significant ripple effect" and (3) whether there is an alternative that fully accommodates the prisoner "at de minimis cost to valid penological interests." *Murphy*, 372 F.3d at 982-83. Defendants state their policy is an accommodation or alternative means to allowing headbands to be worn at all times throughout the prison. *See* Doc. 109-3 at 4-5 ("The present policy is an accommodation to give offenders the most freedom possible with regard to religious items, but at the same time adhere to the security issues of the prison."). Courts have held that similar policies provide a reasonable alternative means to exercise the asserted right to wear religious head items. *See Wallace v. Ste. Genevieve Detention Center*, No. 4:17-CV-490-PLC, 2019 WL 1597457, at *11 (E.D. Mo. Apr. 15, 2019) (citing cases). The second *Turner* factor supports the reasonableness of FDCF's policy. There is no evidence or argument as to the third factor – whether an accommodation would have a "significant ripple effect." As such, I consider this factor to be neutral.

13

Nor have the parties addressed the issue of whether an alternative could fully accommodate plaintiffs "at de minimis cost to valid penological interests." However, the affidavit of Deputy Warden Harris suggests that defendants consider the current policy an alternative that, while not fully accommodating plaintiffs, "give[s] offenders the most freedom possible with regard to religious items, but at the same time adhere to the security issues of the prison." Doc. 109-3 at 4-5. While plaintiffs cite the policy at ISP as evidence of an alternative means that could fully accommodate them, there is no evidence in the record regarding whether ISP presently has the same security concerns related to gang activity as FDCF. *See Fowler v. Crawford*, 534 F.3d 931, 941 (8th Cir. 2008) ("[c]ourts have repeatedly recognized that 'evidence of policies at one prison is not conclusive proof that the same policies would work at another institution.'" (quoting *Spratt v. Rhode Island Dep't of Corr.*, 482 F.3d 33, 41 n.11 (1st Cir. 2007)). Without such evidence, ISP's policy has little relevance as to a workable alternative. Thus, I find the fourth *Turner* factor also supports the reasonableness of the policy. Defendants' motion as to whether its policy concerning religious head items violates plaintiffs' First Amendment rights is granted.

## C. *Temporary Closure and Desecration of Sweat Lodge*

Plaintiffs' claims concerning the sweat lodge are contained under the "First Set of Facts and Cause of Action" in plaintiffs' second amended complaint. Doc. 76 at 7-13. In my previous order, I granted summary judgment to defendants on plaintiffs' claim that identification of the contraband during the search violated plaintiffs' rights. *See* Doc. 97 at 18-24. I denied summary judgment as to plaintiffs' claim that temporary closure of the sweat lodge violated their rights. *Id.* Therefore, three issues remained concerning the sweat lodge: (1) the search, (2) its temporary closure and (2) its desecration. Plaintiffs allege these issues violate the First Amendment as well as RLUIPA. *See id.* at ¶¶ 39-40, 43, 45, 47, 48, 49, 51-52.

Plaintiffs now clarify that their primary issue is the desecration of the sweat lodge and its contents during the search and defendants' refusal to reconsecrate them afterwards. *See* Doc. 112-1 at 9 ("It is not the search of the sweat lodge per se that is the problem. It is the manner of search which desecrated the sweat lodge and its contents and the consequent refusal of Defendants to re-establish and reconsecrate the sweat lodge and its contents that is at issue."). As such, I will not consider the mere fact that a search was performed in evaluating whether defendants' actions violated plaintiffs' religious rights.

Plaintiffs contend there are two factual situations in dispute: (1) the alleged desecration itself (whether based on Morrison's alleged menstruation or the fact that she is female) and (2) the reopening of the sweat lodge. Defendants state the sweat lodge was reopened shortly after closing. Plaintiffs state that based on the alleged desecration and refusal of defendants to reconsecrate the sweat lodge and objects, it was not usable. Defendants argue that whether the sweat lodge was desecrated and whether it required reconsecration to be usable again are religious decisions not subject to resolution by the court.

> RLUIPA provides in relevant part:
>
> [n]o government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution . . . . even if the burden results from a rule of general applicability, unless the government demonstrates that imposition of the burden on that person –
>
> > (1) is in the furtherance of a compelling governmental interest; and
> >
> > (2) is the least restrictive means of furthering that compelling governmental interest.

42 U.S.C. § 2000cc-1(a). Because RLUIPA provides greater protection than the First Amendment, I will begin my analysis there. *See Holt v. Hobbs*, 574 U.S. 352, 361 (2015). Under RLUIPA, a plaintiff bears the initial burden to show that he has a sincere

15

religious belief and that his religious exercise was substantially burdened. *Id.* If a plaintiff makes this showing, the burden shifts to the defendants to demonstrate that their actions further "a compelling governmental interest," and do so by "the least restrictive means." *Cutter v. Wilkinson*, 544 U.S. 709, 712 (2005). "The least-restrictive-means standard is exceptionally demanding," because it requires defendants to "sho[w] that it lacks other means of achieving its desired goal without imposing a substantial burden on the exercise of religion by the objecting part[y]." *Id.* at 364-65 (quoting *Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 728 (2014)).

With regard to the temporary closure of the sweat lodge, defendants argue there was no substantial burden on plaintiffs' religious exercise. I considered this issue in my previous order and found that plaintiffs offered evidence of a grievance from plaintiff Bryon Bauer stating that the closure of the sweat lodge "coincided with a significant memorial observance in December" known as "The Dakota 38+2." Doc. 97 at 22 (citing Doc. 96-2 at 15). While scant, I found this was sufficient to demonstrate a genuine issue of material fact as to whether the 30-day closure imposed a "substantial burden" on plaintiffs' religious practice. *Id.* I noted that defendants would nonetheless be entitled to summary judgment if they could satisfy the *Turner* test with regard to the First Amendment free exercise claim and strict scrutiny as to the RLUIPA claim. Defendants, however, offered only conclusory statements about why the sweat lodge was closed and provided no explanation about the length of the closure or their investigation following the search. *Id.* I concluded defendants were not entitled to judgment as a matter of law under either RLUIPA or the First Amendment on the issue of the temporary closure of the sweat lodge. *Id.* at 23-24.

Defendants again allege plaintiffs have not demonstrated that the temporary closure was a substantial burden on their religious exercise. In response, plaintiffs argue this issue should not be revisited and rely on the same reasons they previously resisted and for the reasons cited by the court. *See* Doc. 112-1 at 10. They have supplied no additional evidence as to why the temporary closure was a substantial burden on their

16

religious exercise, nor do they address the fact that the previous evidence came from a grievance of a plaintiff whom they acknowledge no longer has standing in the case. In defendants' statement of facts, they state "[d]uring the period of the lock down, all Native American[] ceremonies could not occur, but the area was available after a period of approximately two weeks, but there were no holidays or other religiously required events during that time frame." Doc. 109-2 at ¶ 35. In response, plaintiffs stated:

> Admitted that Native American ceremonies could not occur after the search. Denied that the inability of Native Americans to use the sweat lodge and its sacred objects by Judy Morrison during the search, Plaintiffs have been unable to use the sweat lodge and the sacred objects. *See* Dkt. 96-2 – App. 5-6 (Langdeaux Declaration at ¶¶ 46-52). The sweat lodge was removed in October of 2019 by Defendants. *Id.*

Doc. 112-2 at ¶ 35. Plaintiffs failed to respond to the statement that there were no holidays or other religiously required events during that time. As such, that statement is deemed to be admitted. *See* Fed. R. Civ. P. 56(e)(2); Local Rule 56(b) ("The failure to respond to an individual statement of material fact, with appropriate appendix citations, may constitute an admission of that fact."). Plaintiffs have failed to demonstrate a genuine issue of material fact as to whether the temporary closure of the sweat lodge was a substantial burden on their religious exercise. Bauer no longer has standing and neither Langdeaux nor Nielsen have put forward any evidence to suggest that the temporary closure interfered with their ability to practice their religion.[3] Defendants are entitled to summary judgment on the issue of the temporary closure violating plaintiffs' rights under the First Amendment and RLUIPA.

With regard to desecration of the sweat lodge, the parties dispute whether the sweat lodge and its contents were desecrated and, thus, whether they required reconsecration to be used by Native American inmates. *See* Doc. 109-3 at 9 (affidavit

---

[3] I consider the temporary closure to refer solely to the lockdown during the pendency of the investigation following the search. Plaintiffs' complaint regarding the usability of the sweat lodge based on the alleged desecration will be addressed as a separate issue below.

17

from Morrison stating the Native American area was not desecrated by the presence of a female); Doc. 96-2 at 7 (stating belief that sacred items of masculine and feminine energy should remain separate and that Morrison's presence as a female on sacred grounds where men perform ceremonies is a desecration of the area and items). Plaintiffs assert that Morrison's touching of the sacred objects was also in violation of FDCF policy providing that staff members may not touch sacred objects.

I agree with defendants that the issue of whether the sweat lodge was desecrated by the presence of a female or otherwise is a religious dispute, not a factual dispute that neither a court nor jury can resolve. Doing so would require "determin[ing] the meaning of religious doctrine and canonical law and to impose a secular court's view of whether in the context of the particular case religious doctrine and canonical law support the decision the church authorities have made." *Scharon v. St. Luke's Episcopal Presbyterian Hospitals*, 929 F.2d 360, 363 (8th Cir. 1991). "This is precisely the kind of judicial second-guessing of decision-making by religious organizations that the Free Exercise Clause forbids." *Id.*

However, this does not end the inquiry, as defendants do not challenge that this is a sincerely held religious belief or that plaintiffs' inability to use the sweat lodge due to its alleged desecration substantially burdens their religious exercise. Defendants assert they *did* give plaintiffs the opportunity to provide the name of an individual who could consecrate the grounds and that plaintiffs failed to provide any names or designate any individuals who could "open" the facility. *See* Doc. 109-3 at 9. Plaintiffs deny this. *See* Docs. 109-2 and 112-2 at ¶¶ 43, 44. Defendants also state the area has remained open since the investigation was completed and normal operations have returned, indicating the sweat lodge was rebuilt and the men are holding ceremony. Plaintiffs deny this as well, stating the sweat lodge was removed in October 2019. *Id.* at ¶ 46.

18

Thus, disputed issues of fact remain as to this claim (including the seemingly-basic fact of whether a sweat lodge is even present at FDCF at this time) and defendants are not entitled to summary judgment.[4]

## VI. CONCLUSION

For the foregoing reasons, defendants' motion (Doc. 109) for summary judgment is **granted in part** and **denied in part**. The motion is **granted** as to (1) plaintiffs' claims alleging a First Amendment violation based on FDCF's policy limiting the time and place in which headbands may be worn and (2) plaintiffs' First Amendment and RLUIPA claim based on the temporary closure of the sweat lodge. The motion is **denied** as to plaintiffs' First Amendment and RLUIPA claims based on the alleged desecration of the sweat lodge and FDCF's purported refusal to allow reconsecration of the sweat lodge. This case will proceed to trial as scheduled, on this claim only, on June 13, 2022.

**IT IS SO ORDERED.**

**DATED** this 11th day of March, 2022.

_____
Leonard T. Strand, Chief Judge

---

[4] While it appears that these remaining factual discrepancies could be resolved by communication between the parties, I must decide the motion based on the existing record.